IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEVON JACKSON,

                   Plaintiff,

    v.                                         OPINION and ORDER

MIKE THURMER, DEBRA GEMPELER,              09-cv-602-slc
ANTHONY MELI and JOHN O'DONOVAN,

                   Defendants.

---

      May prison officials punish an inmate for confessing that he has violent thoughts, even if he disavows any desire or intent to carry them out? That is the question raised in this lawsuit brought by pro se plaintiff Jevon Jackson, a prisoner incarcerated by the Wisconsin Department of Corrections. Plaintiff was disciplined after informing prison staff that he wished to be placed in observation status out of fear of what he might do in the midst of a panic attack. Plaintiff contends that the punishment he received (placement in disciplinary segregation, loss of his prison job and a prison transfer) violated his rights under the Constitution; defendants contend that plaintiff's discipline was justified by security concerns. Defendants have filed a motion for summary judgment, which is ready for decision. *See* dkt. 21.

      The narrative begins in 2007, when psychological services staff at the Waupun Correctional Institution first classified plaintiff as seriously mentally ill. In 2007 and 2008, plaintiff was placed in observation status multiple times when his symptoms became acute. Psychological services staff became so concerned about plaintiff's panic attacks that they prohibited him from eating with other prisoners in the dining hall. (They did not, however, assign him to a single cell.) The prison psychologist and psychiatrist instructed plaintiff to contact staff to request placement in observation whenever he believed his symptoms might lead him to hurt himself or others.

In late August 2008, plaintiff twice submitted a request to speak with psychological staff, but his requests went unanswered.  On September 1, 2008, he told defendant Debra Gempeler, a supervising officer, that he was suffering from a panic attack and needed to be placed in observation status again.  When she pressed him for specifics, he explained that he "felt like [he] was being chased down as if someone was trying to kill" him, that "he felt trapped in [his] cell" and that he "felt like [he] was going to freak out and strike out against whomever was around [him] as a means of protecting" himself.  After speaking with the on-call psychologist, defendant Gempeler placed plaintiff in segregation and gave him a conduct report for making threats against his cell mate.  Defendant Anthony Meli approved the conduct report and defendant John O'Donovan found plaintiff guilty of making a threat.  Eventually, defendant Michael Thurmer reversed the decision.  However, by that time, plaintiff had been housed in segregation for 45 days, had lost his prison job and had been transferred to another prison.

In the order screening plaintiff's complaint under 28 U.S.C. § 1915, the court allowed him to proceed on a claim that "defendants violated his right to free speech by disciplining him for requesting mental health treatment."  Dkt. 5, at 2.[1]  The parties' summary judgment materials show that it was not simply plaintiff's request to be placed in observation that triggered the discipline.  This does not end the matter, however, because defendants admit that plaintiff was punished for his speech.  In particular, defendant Gempeler admits that she gave plaintiff a conduct report because of what he told her about his volatile emotional state.

---

[1]In his response brief plaintiff raises a new claim that defendants violated his rights under the Eighth Amendment by failing to provide him adequate treatment.  *See* dkt. 29, at 7.  The court will not consider this claim because plaintiff did not raise it in his complaint and he has not been granted leave to proceed on it.

I conclude that defendants' motion for summary judgment must be denied as to defendant Gempeler, whose decision to discipline plaintiff was not reasonably related to a legitimate penological interest, as it must be to survive scrutiny under the First Amendment. It is debatable whether it is ever legitimate to punish a prisoner simply because he admits to having a particular thought, even if it is violent or disturbing; generally, "thought crimes" are anathema to the First Amendment. Regardless, in this case there is no logical connection between the institution's security interests and punishing a prisoner for revealing violent thoughts that he could not help thinking but on which he had not acted. To the contrary, a practice of punishing such revelations might have the unintended effect of deterring prisoners from alerting staff of simmering psychological problems due to their fear of reprisal. This could result in staff not learning of a prisoner's psychological problems in time to ameliorate them . In this case, plaintiff did exactly what DOC's psychologists instructed him to do to prevent himself from becoming violent. Defendants have identified no alternative course of conduct that plaintiff should have taken.

Because defendants Meli and O'Donovan approved defendant Gempeler's conduct report, the motion for summary judgment must be denied with respect to them as well. However, Thurmer cannot be held liable because he correctly reversed the decision of the other defendants. Although this occurred too late to undo the damage, there is no evidence that Thurmer purposely delayed his decision to prolong plaintiff's harm.

The undisputed facts, taken from the parties' proposed findings of fact and the record, are set forth below. In accordance with this court's summary judgment procedures, I have treated all properly supported facts as undisputed unless the other side supported its alleged dispute with a citation to the record. *Procedure to be Followed on Motions for Summary Judgment*,

II.D, dkt. 15 ("If you dispute a proposed fact, state your version of the fact and refer to evidence that supports that version."); *Helpful Tips for Filing a Summary Judgment Motion*, Tip No. 3, dkt. 15 ("A fact properly proposed by one side will be accepted by the court as undisputed unless the other side responds to the proposed fact and establishes that it is in dispute.").

## UNDISPUTED FACTS

Plaintiff Jevon Jackson suffers from depression, bipolar disorder and panic attacks from post traumatic stress disorder. During the time relevant to this lawsuit, plaintiff was incarcerated at the Waupun Correctional Institution (WCI). Beginning in May 2007, WCI's psychological services staff classified plaintiff as an "MH-2," that is, seriously mentally ill. *See also Marshall v. Walsh*, No. 06-cv-617-bbc, 2008 WL 4949921, *1 (W.D. Wis. Nov. 2008) (discussing various serious mental illnesses that fall under MH-2 classification). Plaintiff was prescribed various medications to cope with his conditions. Ordinarily, plaintiff met with prison psychologist Dr. Gene Braaksma or prison psychiatrist Dr. Callister two or three times each month.

In June 2007, psychological services staff placed a "clinical restriction" on plaintiff that prohibited him from eating in the dining hall because he experienced panic attacks there. Staff placed plaintiff on "observation status" once in May 2007 as a result of a major depressive episode, and again in April 2008 as the result of a panic attack. Observation status is a

> nonpunitive status to be used for the temporary confinement of an inmate to ensure the inmate's safety and the safety of others if the inmate is mentally ill and dangerous, is dangerous to himself or herself, has a medical problem that requires separation from the population for treatment, or refuses testing for a communicable illness.

> Wis. Admin. Code § DOC 311.01.

4

Prisoners on observation status are stripped of all clothing, provided a smock to wear and placed in a segregated cell that is bare with the exception of a rubber mat. All personal property is confiscated. Generally, placement in observation status is short-term, just long enough for the prisoner to weather a crisis period without harming himself or others. In both instances that plaintiff was placed on observation status, he was returned to his assigned cell after three days.

Dr. Braaksma had instructed plaintiff to contact staff immediately and ask to be placed in observation status whenever he is "feeling psychologically unstable, suicidal or experiencing the severe end of panic attack." Dr. Callister had given plaintiff similar instructions.

On August 20, 2008, plaintiff wrote to Dr. Braaksma, asking to talk about plaintiff's mental health problems. Dr. Braaksma did not respond. On August 25, 2008, plaintiff sent a followup request, directed to "any available" member of the psychological services staff, in which plaintiff reported that his mental health was deteriorating: plaintiff reported experiencing hallucinations, having trouble sleeping and being "consumed with excited/nervous energy."

On the morning of September 1, 2008, plaintiff began experiencing the symptoms of a panic attack. After the other prisoners in his unit went to the dining hall to eat lunch, plaintiff told the unit sergeant that he needed to be placed on observation status. Defendant Debra Gempeler, a "supervising officer 2" at the prison, responded. She asked plaintiff why he wanted to be placed on observation status. Plaintiff responded that he did not "feel comfortable talking about specific things," but that he was "feeling mentally unstable now." (Plaintiff says that he did not feel comfortable because other prisoners were walking in front of the cell.)

Defendant Gempeler took plaintiff to the administrative building so that they could discuss his concerns privately. She asked him again why he wanted to be placed on observation

status.  He told her that psychological services staff had instructed him to request placement on observation status anytime he felt psychologically unstable.  She told him that he could not be placed on observation status "unless he explained specifically why" he was making the request.[2]

Plaintiff described the symptoms he was experiencing:

> It felt like I was being chased down as if someone was trying to kill me and because I felt trapped in that cell, with no place to retreat to for safety that I felt like I was going to freak out and strike out against whomever was around me as a means of protecting myself.

Pltf. Aff., dkt. 32, at ¶ 35.

Gempeler asked whether he was having "those kind of thoughts" about his cellmate.  Plaintiff responded, "who's ever around me in that moment."  In addition, plaintiff said that he did not have any arguments or altercations with his cellmate but that "sometimes he experience[d] panic attacks and uncontrollable destructive thoughts for what appears to be no reason at all."  (The parties dispute whether plaintiff said that "he had been trying to get out of his cell but his requests were not being granted."  Plaintiff says that he told Gempeler only that he had made requests to go to the psychological services unit to talk to someone about his problems.)

Security staff do not have authority to place a prisoner in observation status unless no clinician, crisis intervention worker or physician is available for consultation.  No psychologist was at WCI at the time, so defendant Gempeler contacted the "on-call psychologist/clinician," Dr. Grisdale.  Neither side provides details of that conversation, although plaintiff says that

---

[2] In their responses to plaintiff's proposed findings of fact, defendants dispute this fact.  Resp. to Plt.'s PFOF ¶ 29, dkt. 35.  However, defendant Gempeler admitted the fact in her response to plaintiff's requests for admission, dkt. 32-13, at 18-19, and defendants do not cite any other evidence that contradicts the admission.

Gempeler left the room for approximately 30 minutes.  Gempeler summarizes the conversation in one sentence: she told Grisdale that plaintiff reported "having thoughts of harming/killing his cell mate and wanted to be placed in observation" and Grisdale told Gempeler that it would not be appropriate to place plaintiff on observation status, but it "likely was" appropriate to place him on "temporary lockup status" for "making threats."

Defendant Gempeler told plaintiff that she had spoken to the on-call psychologist and that she was not going to place plaintiff on observation status.  Plaintiff told Gempeler that she should contact one of the staff members who had instructed him to request observation status when he was in a "troubled mental state."  In response, Gempeler said, "that's something you're gonna have to work out when you go on your ticket [disciplinary hearing] because I'm really sick of you guys trying to play crazy."

Defendant Gempeler placed plaintiff in temporary lockup.  Although temporary lockup is a "nonpunitive segregated status," Wis. Admin. Code § DOC 303.02(22), Gempeler put plaintiff in a punitive segregation unit where other prisoners were serving disciplinary sentences. The same day, defendant Gempeler issued a conduct report to plaintiff for violating Wis. Admin. Code § DOC 303.16(1), which prohibits a prisoner from "[c]ommunicat[ing] to another a plan to physically harm, harass or intimidate that person or another."   Under the heading "Description of Incident," she wrote the following:

> On the above date and time [September 1, 2008 at 4:30 p.m.] Sgt. Congelton requested that I respond to the Northwest Cell Hall because inmate Jevon Jackson #299078 was requesting to be placed in observation status.  Upon arriving in the NWCH inmate Jackson informed me of the same.  I escorted him to the Overpass for privacy where he told me he was having homicidal thoughts toward his cell-mate [prisoner's name omitted].  Inmate Jackson stated that he's been trying to get out of the cell but his requests

are not being granted.  Inmate Jackson denied that he was having auditory hallucinations.

Defendant Anthony Meli, a "supervising officer 2" at the Waupun prison, reviewed the conduct report on September 2, 2008.  He noted that plaintiff was in temporary lockup and that the charge was for making a threat.  He "decided that the conduct report could proceed."  (The parties do not explain why Meli was reviewing the report or what authority he had to approve or disapprove the report.)

On September 5, 2008, plaintiff wrote to the security director, Don Strahota, to ask about the "proper procedures to follow when an inmate is suffering from panic attacks and other mental health problems, feels as if someone is trying to kill him, and has uncontrollable thoughts of harming others in those moments."  Plaintiff wrote similar letters to defendant Meli and Dan Westfield, the security chief for the Wisconsin Department of Corrections.  The security director wrote in response:  "You should contact any available staff member and tell them your problem.  And since you know yourself better than anyone, it would be appropriate to request observation."  Defendant Meli wrote that inmates "can contact any staff member regarding their psychological problems at anytime and are encouraged to do so."  Westfield wrote, "[i]f an inmate has a psychological problem that is urgent in nature, contacting any DOC staff member is appropriate and recommended."

On September 5, 2008, plaintiff received a hearing before defendant John O'Donovan, another supervising officer 2.  Plaintiff told O'Donovan that he had been following the instructions from the psychological services staff to request observation status when he could not control his thoughts.  In a written decision dated October 7, 2008, O'Donovan found plaintiff guilty of violating Wis. Admin. Code § DOC 303.16(1):

8

I find the reporting staff credible. The report writer has no vested interest in the outcome of this hearing. The inmate was asked if he wanted this hearing held as a waiver and he stated that he did.

I note that the report is written by a supervisor and that she had interviewed the inmate and he informed her that he was having homicidal thoughts about his cell mate.

I note that the inmate was celled with another inmate.

The report states that the inmate told the Captain that he had been trying to get out of the cell, and his requests were not being granted. The way this is written, the hearing officer believes these requests occurred prior to the inmate's announcement of having homicidal thoughts towards his cell mate.

After reviewing the report, evidence, and all of the testimony, I find that it is more likely than not that the inmate communicated to another a plan to hurt, harm, harass or intimidate another by telling a Captain that he was having homicidal thoughts about/toward his cell mate in order to get removed or get his cell mate removed from the cell.

O'Donovan sentenced plaintiff to 90 days in disciplinary separation. In addition, plaintiff lost his prison job.

Plaintiff appealed the decision to defendant Michael Thurmer, the warden. (The parties dispute whether defendant Thurmer was aware of the incident before the appeal through three letters plaintiff says he wrote Thurmer in September 2008.) In the meantime, plaintiff had a hearing before the program review committee to determine his placement and classification. Plaintiff told the committee that he wanted to stay at the Waupun prison because "he was getting comfortable with the psychologist and psychiatrist." The committee discussed the recent conduct report. It recommended plaintiff for "maximum custody" and transfer to the Columbia Correctional Institution. The finding of guilt on the conduct report was "a factor" in that decision. Plaintiff was transferred to the Columbia prison on November 25, 2008.

On December 1, 2008, Thurmer "revers[ed] the findings of the hearing officer of guilty of 303.16(1)."  He did not provide an explanation.  Before Thurmer reversed the decision, plaintiff had spent 45 days in segregation.  (Three months passed between the time defendant Gempeler placed plaintiff in segregation and defendant Thurmer reversed the decision, but neither side explains why plaintiff spent only half that time in segregation or identifies the day that plaintiff was released.)

Since this incident, plaintiff has not spoken openly to prison staff about his mental health concerns.  In May 2009, psychiatric staff took plaintiff off all psychotropic medications because he refused to talk about his problems.

OPINION

Defendants raise several arguments in their summary judgment motion:  (1) plaintiff's speech is not protected by the First Amendment; (2) the deprivation he suffered is not sufficiently serious to give rise to a claim under the Constitution; (3) plaintiff has failed to prove that defendant Gempeler had an "unconstitutional motive" when she issued the conduct report; and (4) the remaining defendants were not personally involved in any alleged constitutional violation.  I consider each of these arguments in turn:

**(1) Protected Speech**

The parties agree that plaintiff's claim is governed by the standard set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987), which is whether defendants' actions are "reasonably related to legitimate penological interests."  This standard applies generally to all claims under the First Amendment brought by prisoners. *Shaw v. Murphy*, 532 U.S. 223, 229 (2001).  *See also Watkins*

*v. Kasper*, 599 F.3d 791, 796-97 (7th Cir. 2010) (applying *Turner* to prisoner's claim that prison officials punished him for his speech). In determining whether a reasonable relationship exists, the Supreme Court generally considers four factors: whether a "valid, rational connection" exists between the regulation and the legitimate interest put forth to justify it; whether "alternative means of exercising the right . . . remain open to prison inmates"; "the impact accommodation of the asserted constitutional right" will have on prison officials and inmates; and the availability of "obvious, easy alternatives" to the challenged regulation. *Turner*, 482 U.S. at 89-90.

Prison officials have the initial burden to show a logical connection between the restriction on the prisoner's speech and their legitimate interest. *Beard v. Banks*, 548 U.S. 521 (2006) ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."); *Singer v. Raemisch*, 593 F.3d 529, 536-37 (7th Cir. 2010) ("[T]he burden shift[s] to" prisoner "once the prison officials provid[e] the court with a plausible  explanation."); *King v. Federal Bureau of Prisons*, 415 F.3d 634, 639 (7th Cir. 2005) ("[T]he government must present some evidence to show that the restriction is justified").

In justifying the conduct report, defendants rely primarily on their characterization of plaintiff's speech as a threat to his cell mate. This argument is fine as far as it goes. It is well established that "the First Amendment does not preclude restrictions on certain categories of speech having little or no social value, and threats are one such category." *United States v. Parr*, 545 F.3d 491, 496-97 (7th Cir. 2008). *See also United States v. Shoulberg*, 895 F.2d 882, 886 (2d Cir. 1990) ("The First Amendment does not guarantee a right to make intimidating threats."). Further, I agree with the defendants that "[t]here is an obvious connection between the legitimate penological interest of security and punishing an inmate for threatening another

inmate: [a]llowing inmates to threaten each other is a threat to the safety and security of the prison because it substantially increases the risk of inmate-on-inmate violence."  Dfts.' Br., dkt. 22, at 6.

All this being so, "[w]hat is a threat must be distinguished from what is constitutionally protected speech."  *Watts v. United States*, 394 U.S. 705, 707 (1969).  Defendants fail to make that distinction.  The conduct report cannot be upheld on the ground that plaintiff threatened his cellmate because nothing that plaintiff said to defendant Gempeler reasonably could be interpreted as a threat to anyone, something that Warden Thurmer implicitly acknowledged when he reversed the finding of guilt.

Following the instructions of WCI's own psychiatrist and psychologist, plaintiff asked staff to place him in observation status because he felt unsafe.  Only when defendant Gempeler pressed plaintiff for specifics did plaintiff respond that he "felt like [he] was being chased down" and that he could "strike out" against anyone around him.  Plaintiff emphasized, however, that he did not have "any arguments or altercations with his cell mate," making it clear that he wished his cellmate no harm.

Generally, a statement qualifies as a threat, unprotected by the First Amendment, if it is "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Virginia v. Black*, 538 U.S. 343, 359 (2003).  In this case, plaintiff was not communicating an intent or desire to harm another person; he was simply trying to verbalize his suffocating anxiety, as defendant Gempeler directed him to do.  "A government entity . . . runs afoul of the First Amendment when it punishes an individual for pure thought."  *Doe v. City of Lafayette, Indiana*, 377 F.3d 757, 765 (7th Cir. 2004).  *See also*

*United States v. Balsys*, 524 U.S. 666, 713-14 (1998) (Breyer, J., dissenting) ("[T]he First Amendment protects against the prosecution of thought crime."); *Griswold v. Connecticut*, 381 U.S. 479, 482 ("The right of freedom of speech and press includes . . . freedom of thought"); *United States v. Schwimmer*, 279 U.S. 644, 654-55 (1929) (Holmes, J., dissenting) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought").

Of course, the standard under the First Amendment for determining what speech is protected from criminal prosecution is not the same as the standard for determining appropriate prison discipline. Courts "must accord substantial deference to the professional judgment of prison administrators," *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), particularly on matters of security. *E.g.*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989) (upholding regulation that prohibited prisoners from receiving publications "detrimental to the security, good order, or discipline of the institution"); *Singer*, 593 F.3d 529 (deferring to prison staff's assessment that role playing games were detrimental to security); *Koutnik v. Brown*, 456 F.3d 777 (7th Cir. 2006) (deferring to prison staff's assessment regarding gang symbols).

However, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Thus, prison officials cannot avoid court scrutiny of speech restrictions merely by characterizing that speech as a "threat." *Cf. Greybuffalo v. Kingston*, 581 F. Supp. 2d 1034, 1042 (W.D. Wis. 2007) (recognizing that gang suppression is important interest, but concluding that prison officials cannot justify censorship simply by labeling document "gang literature"). The salient question is not whether defendants have

identified a legitimate interest, but whether there is a reasonable nexus between that interest and the decision to punish plaintiff for what he said.

Defendants do not argue in their brief that it was reasonable for them *to believe* that plaintiff's statements to defendant Gempeler were actual or veiled threats to harm his cell mate. Their intent or motive is irrelevant under *Turner*. *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) (stating that *Turner* presents "an objective inquiry" and rejecting argument that "motive matters" under *Turner*).

Defendants may mean to argue that regardless whether plaintiff intended to make a threat, it was reasonable for them to act on his statement because it suggested there was a risk that plaintiff would act violently toward his cellmate. This is true. Regardless whether plaintiff intended to harm anyone, the First Amendment would not prohibit prison officials from taking proactive measures to prevent an assault. *Cf. Doe*, 377 F.3d at 767 n.8 (upholding city's prohibition on convicted sex offender from visiting public parks; "[t]he City was not bound to wait until Mr. Doe again committed the crime of child molestation or attempted child molestation in order to act"). In fact, the Eighth Amendment required defendant Gempeler to protect both plaintiff *and his cellmate* from substantial risks of serious harm. *E.g., Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) (prison officials may be held liable if they know that prisoner is likely to be assaulted but take no action to prevent the assault).

As a result, defendant Gempeler essentially was obliged to separate plaintiff from other prisoners. If she had stopped there, then her response would have satisfied the standard under *Turner*. It would have been an efficient and graceful solution to this very real problem to place plaintiff in temporary lockup to "cool down a volatile situation." Wis. Admin. Code § DOC

14

303.11 Appx..  But defendant Gempeler did not stop there.  She took it to the next level by issuing plaintiff a conduct report and initiating disciplinary proceedings against him.  This was inconsistent with *Turner* because there is no logical connection between an interest in safety and punishing a prisoner for describing his thoughts in a situation like this one.

Punishing a mentally ill prisoner for reporting a panic attack that might escalate into physical violence will not quell that prisoner's unwelcome thoughts or prevent their recurrence. More likely, such a reaction by WCI custodial staff teaches prisoners that they are chumps for following the professional advice of WCI's mental health staff, and it encourages them to clam up and hope they don't lose control rather than seek staff assistance. In this situation, defendants' argument that plaintiff's speech "substantially increase[d] the risk of inmate-on-inmate violence" is a non sequitur.  It does not follow that plaintiff was more likely to become violent simply because he put into words the mental decompensation he was experiencing.  To the contrary, plaintiff's statements allowed defendant Gempeler to  preempt a possible altercation.

Because defendants' discipline of plaintiff does not meet the first *Turner* factor, it is unnecessary to consider the other three.  An irrational restriction on speech is always invalid. *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) ("The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement.") (citing *Turner*, 482 U.S. at 89, and *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987)).  *See also Singer*, 593 F.3d at 534 ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts.").  Even if it were necessary to consider the other factors, they support plaintiff as well.

15

For instance, as to the second factor, whether plaintiff had alternatives to exercising his right to free speech, defendants do not suggest what plaintiff could have or should have done differently.  (In fact, the security director of the prison, the security chief for the Department of Corrections, and even defendant Meli confirmed to plaintiff in writing that he did exactly what he should have by voicing his concerns to staff.)  There was no way that plaintiff could modify his statements to make them seem "less threatening" without misrepresenting the gravity of the situation as he perceived it.  Plaintiff's only alternative would be to say nothing and risk a meltdown.

With respect to the third and fourth factors, the "obvious and easy alternative" for defendants would be to act on their legitimate safety concerns without punishing plaintiff.  Such an "accommodation" of plaintiff's right–and need–to speak freely about his mental state would not adversely affect staff or other prisoners.  If anything, encouraging prisoners to seek help when they fear they will act out would promote institutional safety and security.

Defendants drop a footnote referring to defendant O'Donovon's conclusion in the disciplinary decision that plaintiff was trying "to get removed or get his cell mate removed from the cell."  Defendants argue that "[p]rison staff have a legitimate penological interest in preventing inmates from manipulating circumstances so they can select their own cell mates."  Dfts.' Br., dkt. 22, at 6 n.2.  This proposition is true as a general matter but it doesn't apply to what happened here.

In their responses to plaintiff's proposed findings of fact, defendants do not deny that plaintiff suffered a debilitating panic attack on September 1, 2008 and in their briefs they offer no logical reason to conclude that plaintiff was lying about his symptoms in order to weasel a

better cell assignment. It is undisputed that plaintiff suffers from various mental illnesses; he had been placed in observation status on multiple occasions because of these illnesses; WCI mental health staff had instructed him to ask to be placed on that status if he felt unsafe; and plaintiff knew that this status triggered unpleasant consequences, including a strip search and deprivation of all his property.  Thus, there is paltry evidence to support an opinion that plaintiff was faking it, or even had a reason to.  Defendants do not explain why a prisoner would request observation status as a ruse to get a new cellmate.  When plaintiff had been placed in observation in the past, he was returned after a short time to the cell whence he had come.  Defendants' failure to address these issues or to develop any argument whatsoever constitutes waiver of "manipulation" as a ground for justifying plaintiff's discipline. *Pond v. Michelin North America, Inc.*, 183 F.3d 592, 597 (7th Cir. 1999) ("[A]rguments raised in a conclusory or underdeveloped manner" are "waived.")

Even if the court  assumes, *arguendo*, that defendants preserved the manipulation issue, they cannot prevail on it.  The only support for the assertion is defendant Gempeler's testimony that plaintiff told her that "he had been trying to get out of his cell but his requests were not being granted."  Because plaintiff denies that he made that statement, I could not grant summary judgment on this ground, at least as to defendant Gempeler.  *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) ("On summary judgment a court may not make credibility determinations.") (internal quotations omitted).

More critically, I cannot consider this justification because it has nothing to do with the conduct report that plaintiff actually received.  Plaintiff was not disciplined under a rule against lying to staff or for trying to tamper with cell assignments; he was disciplined for making a

threat.  The question in this case is whether the conduct report plaintiff received is valid, not whether defendants could have disciplined him for a different violation.  *Brooks v. Andolina*, 826 F.2d 1266, 1268 (3d Cir. 1987) (rejecting prison officials' attempt to justify discipline on different grounds than what he was charged with); *Koutnik v. Berge*, No. 03-C-345-C 2004 WL 1629548, *8 (W.D. Wis. Jul. 19, 2004) ("[T]o avoid liability, [defendants] cannot argue now that [the prisoner's speech] could have been justifiably censored on other grounds.")

### (2)  Plaintiff's Injury

Defendants' second argument is that plaintiff "cannot establish that he suffered a deprivation that would likely deter him from future exercise of his First Amendment rights." Dfts.' Br., dkt. 22, at 7.  If the standard were subjective, as defendants suggest, then plaintiff would meet it easily.  He says that he *has* been deterred in that he no longer discusses his mental health concerns with prison staff.  However, the standard is objective.  The question is not whether plaintiff has been deterred or is likely to be, it is whether plaintiff's injury was "so trivial that *a person of ordinary firmness* would not be deterred from" exercising his constitutional rights. *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (emphasis added).  Plaintiff meets this threshold.

Plaintiff's injuries were not limited to a blot on his record that was later expunged. *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009). It is undisputed that plaintiff spent 45 days in disciplinary segregation and lost his prison job as a result of the conduct report.  In addition, defendants admit that  the conduct report was a "factor" in the decision to keep plaintiff in "maximum custody" and to transfer him to a different prison.

18

Defendants cite no authority for the proposition that such injuries are "trivial" under *Pieczynski*. In other cases, courts have found that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness.'" *Kaba v. Stepp*, 458 F.3d 678, 686 (7th Cir. 2006) (quoting *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004)). If staff threats and intimidation are sufficiently punitive, then it is difficult to see how 45 days in disciplinary segregation are not. Although this amount of time in segregation may not be an "atypical and significant hardship" under the due process clause, *Sandin v. Conner*, 515 U.S. 472, 484 (1995), it cannot be denied that disciplinary segregation is an unpleasant environment that most prisoners wish to avoid.

Further and by analogy, in employment lawsuits, being terminated generally suffices to sustain a claim. *Massey v. Johnson*, 457 F.3d 711, 720 (7th Cir. 2006) (in First Amendment context, formal discharge may be actionable if designed to deter public employee's free speech). I see no reason why to apply a different rule to plaintiff just because he was employed in a prison. *Hennings v. Ditter*, 06-C-353-C, 2007 WL 5445543, *6 (W.D. Wis. June 7, 2007) (concluding that loss of prison job meets *Pieczynski* standard).

Finally, the court of appeals has assumed that a prisoner could sue under the First Amendment if he is transferred to a different prison because of his speech. *E.g., Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996). However, because I have concluded that plaintiff's other injuries are sufficient, I need not decide whether there is a sufficient causal connection between plaintiff's conduct report and his subsequent transfer.

### (3)  Causation

Defendants' final argument as to defendant Gempeler is that plaintiff has failed to establish that she had an "unconstitutional motive" for giving plaintiff the conduct report.  Most of defendants' discussion on this issue is devoted to showing that Gempeler was not "out to get" plaintiff.  Defendants seem to misunderstand the standard.  It is true that a plaintiff asserting a claim for retaliation must adduce evidence that his protected speech is a "motivating factor" for the defendant's adverse treatment of him.  *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009).  However, this does not mean, as defendants seem to believe, that plaintiff must show that Gempeler had an evil motive or a subjective intent to deter him from speaking.  The "motivating factor" element in First Amendment retaliation claims simply means that the plaintiff must show a "causal connection" between his protected speech and the defendant's adverse treatment of him.  *Watkins*, 599 F.3d at 794.  In this case, defendant Gempeler acknowledges that she gave plaintiff a conduct report because of his speech, and I have concluded that this speech was protected by the First Amendment.  This establishes causation. In a case where it is undisputed that the prisoner was disciplined because of a statement he made, the question of "retaliatory motive" falls out of the picture.

In their discussion of "motive" in both their opening and reply briefs, defendants emphasize that defendant Gempeler did not give plaintiff a conduct report until the "on-call" psychologist told her that plaintiff should not be placed on observation status.  Defendants do not explain the relevance of this fact or cite authority suggesting that it has any bearing on Gempeler's potential liability.  It may be that defendants mean to argue that Gempeler cannot

be held liable because she relied on the advice of the psychologist.  If this is their argument, it fails for several reasons.

First, defendants have  not provided details of defendant Gempeler's conversation with the on-call psychologist, making it impossible to determine whether she gave him enough information and context to permit an accurate assessment.  It would be inappropriate to use the doctor's opinion as a shield if that opinion had been given in reliance on a misleading or materially incomplete recitation of the facts.

Second, to the extent defendants would be entitled to rely on the psychologist's recommendation, this would be limited to determining whether plaintiff should receive mental health treatment.  Nonmedical staff may defer to a health care provider's *medical* judgment. *Berry v. Peterman*, 604 F.3d 435, 440-41 (7th Cir. 2010); *Hayes v. Snyder*, 546 F.3d 516, 526-28 (7th Cir. 2008). This means, for example, that Gempeler could not be held liable under the Eighth Amendment for following the psychologist's advice in refusing to place plaintiff on observation status.[3]

Defendant Gempeler would have no reason to defer to a psychologist's recommendation on a security question, that is, whether plaintiff should be *disciplined* for his speech.  Security is defendants' area of expertise, not the psychologist's.  Further, defendant Gempeler had an independent obligation under the First Amendment to determine for herself whether a conduct report was an appropriate response. *N.N. ex rel. S.S. v. Madison Metropolitan School District*, 670 F. Supp. 2d 927, 933 (W.D. Wis. 2009) ("[P]ublic officials have an obligation to follow the

---

[3] For this reason, plaintiff likely could not prevail on his alternative claim that defendants failed to provide adequate mental health care when he requested it.  Plt.'s Br., dkt. 29, at 7.  However, as noted in the introduction, I do not reach that question because that claim falls outside the scope of this case.

Constitution even in the midst of a contrary directive from a superior or in a policy.") *Accord Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010); *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004). In any event, the psychologist did not instruct Gempeler to give plaintiff a conduct report, so, on that matter, there was no judgment to which Gempeler could defer. Accordingly, I conclude that defendants' motion for summary judgment must be denied as to defendant Gempeler.

### (4). Personal Involvement

Finally, defendants argue that Meli, O'Donovan and Thurmer may not be held liable because they had no "personal involvement" in the alleged constitutional violation. The phrase "personal involvement" does not appear in the First Amendment or 42 U.S.C. § 1983. Rather, courts use this term as shorthand for the requirement in § 1983 that a state employee may not be held liable for damages unless he "subjects or causes to be subjected" a person to a constitutional violation. *E.g., Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003). This means that defendants "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988).

Defendants are correct that plaintiff cannot meet this standard with respect to Warden Thurmer. Warden Thurmer did not "approve" the disciplinary action taken against plaintiff; he disapproved it by reversing the finding of guilt. Plaintiff faults Thurmer for failing to intervene when he sent Thurmer letters about the incident in September 2008 and for taking almost two months to issue his decision after plaintiff filed his appeal. But plaintiff cites no authority for the proposition that a defendant may be held liable under § 1983 simply because

he did not act as swiftly as the plaintiff would have hoped. With respect to the letters plaintiff says he wrote, even if I assume that Thurmer received and read the letters, Thurmer was entitled to let the process run its course. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Public officials do not have a free-floating obligation to put things to rights, disregarding rules . . . along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). With respect to the time it took for Thurmer to decide the appeal, plaintiff adduces no evidence that Thurmer purposely delayed his decision in order to prolong the adverse effects of the conduct report. Accordingly, defendants' summary judgment motion must be granted with respect to Thurmer.

The same outcome is not available to defendants Meli and O'Donovan because each of them approved the conduct report. Defendants cite *Wilson v. Greetan*, 571 F. Supp. 2d 948, 955 (W.D. Wis. 2007), for the proposition that a "person who approves or upholds a conduct report may be held liable only if he or she had actual knowledge that the conduct report was issued to retaliate against the plaintiff." Dfts.' Br., dkt. 22, at 9. This is another misdirected argument about "motive." The question is not whether defendants acted with scienter, but simply whether they "approved" a conduct report that was invalid on its face. *Id.* at 955 (prison official may be held liable under § 1983 for "approving" unconstitutional conduct if he "know[s] of the facts that make the conduct unconstitutional").

In *Wilson*, the plaintiff received a conduct report accusing him of attempting to obtain personal information about staff. The plaintiff did not argue that such an attempt was protected by the First Amendment. Instead, he argued that the conduct report was fabricated and issued in retaliation for a statement plaintiff made accusing the defendant of being corrupt. This court

23

concluded that a disciplinary hearing officer who approved the allegedly unconstitutional conduct report could not be held liable under § 1983 because the plaintiff failed to adduce sufficient evidence to show that the officer knew the report was false. *Id.* at 955-56.

In this case, plaintiff is not arguing that Gempeler fabricated her conduct report against him, he is arguing that the report was facially invalid, yet defendants Meli and O'Donovan upheld it anyway. As in *Wilson*, Meli and O'Donovan cannot be held accountable for what they did not know. Thus, their liability can only be based on what they read in Gempeler's terse conduct report, which omits many contextual details. Gempeler's description of plaintiff's sanctionable conduct was that "[plaintiff] was requesting to be placed in observation status . . . . I escorted him to the Overpass for privacy where he told me he was having homicidal thoughts toward his cell-mate."

It might seem punctilious, but given the actual charge Gempeler leveled against plaintiff in the conduct report, it's important to distinguish between being a threat and making a threat. Gempeler's report allows the conclusion that plaintiff might *be* a threat to his cellmate, but it does not allow the conclusion that he had *made* a threat to harm his cellmate. Defendant Meli suggests that he relied on defendant Gempeler's citation to the rule against threats, but this would not justify his decision to allow the report to go forward. It is not the label Gempeler gave it that is important, it is whether her report of plaintiff's conduct is consistent with that label. As already noted, Meli's role in the process is unclear, but the court can envision a perfunctory review to cull from the stack obviously defective conduct reports. If this were Meli's role, then it would be easy to hypothesize how plaintiff's report slipped through the cracks: it's a § DOC 303.16(1) charge, written up by a captain, and it contains the words "told me," "homicidal

thoughts" and "cell-mate" all in the same sentence.  Even so, the defects with this "threats" charge would have been sufficiently plain from a careful reading and brief cogitation so as to hold Meli liable for failing to recognize the defects and act on them.

Defendant O'Donovan repeats his statement from the disciplinary decision that plaintiff was lying about the thoughts in his head so that he could get a different cell assignment.  I have rejected this argument and need not address it again.  The bottom line is that for the purpose of holding Meli and O'Donovan liable under § 1983, it makes no difference whether they honestly believed Gempeler's account because even her version failed to provide a justification for the conduct report that was consistent with the First Amendment.

### (5).  Remaining Issues for Trial

Plaintiff did not file his own motion for summary judgment.  Generally, a court may not enter judgment in favor of a nonmoving party unless the other side has both notice of this possibility and an opportunity to be heard.  *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006).  However, in light of the conclusions in this opinion, it is doubtful whether any factual questions remain for trial with respect to liability.  Accordingly, I will give defendants an opportunity to show cause why summary judgment should not be granted to plaintiff on his claim against defendants Gempeler, Meli and O'Donovan.

In addition, now it is time for plaintiff to clarify what issues remain for trial with respect to damages.  Plaintiff does not seek injunctive relief in his complaint, presumably because he recognizes that he cannot obtain an injunction against defendants who work at a prison where he no longer is housed.  *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("When a prisoner

who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot.")

Ordinarily, plaintiffs suing under § 1983 may request nominal, compensatory and punitive damages. However, plaintiff should be aware that 42 U.S.C. § 1997e(e) prevents him from obtaining damages for any emotional pain and suffering because his claim does not involve a physical injury. With respect to any economic losses plaintiff claims to have sustained, it will be his burden at trial to prove them by a preponderance of the evidence. *Memphis Community School District v. Stachura*, 477 U.S. 299 (1986). To recover punitive damages, plaintiff will have to prove that defendants acted with "evil motive or intent" or with "reckless or callous indifference" to his First Amendment rights. *Smith v. Wade*, 461 U.S. 30 (1983). Even if plaintiff were to make this showing, the jury can choose to award or deny punitive damages as it sees fit.

Therefore, plaintiff should submit a memorandum in which he details each type of compensatory damages he is claiming and the evidence he has to support the claimed loss. If plaintiff intends to ask for punitive damages, he does not need to identify the amount he will request, but he must identify the evidence he intends to introduce at trial that would show that he is entitled to punitive damages. If it is clear from plaintiff's memorandum that he will be unable to prove that he is entitled to a particular type of damages, then the court may remove that issue from the trial. As always, the parties are free in this case as in any other case to settle their remaining disputes without a trial.

ORDER

IT IS ORDERED that:

(1)    The motion for summary judgment filed by defendants Mike Thurmer, Debra Gempeler, Anthony Meli and John O'Donovan, dkt. #21, is GRANTED with respect to defendant Thurmer. The motion is DENIED as to defendants Gempeler, Meli and O'Donovan.

(2)    Defendants Gempler, Meli and O'Donovan may have until October 8, 2010, to show cause why summary judgment should not be granted to plaintiff with respect to the question of liability.

(3)    Plaintiff may have until October 8, 2010, to file and serve a memorandum identifying the damages he is requesting and the evidence he has to support those requests.

Entered this 29th day of September, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

27